In the Matter of Larry ROSE, Bankrupt.

Larry ROSE, Plaintiff,

v.

CONNECTICUT HOUSING FINANCE AUTHORITY, Defendant.

Bankruptcy No. H–77–501.

United States Bankruptcy Court, D. Connecticut.

Oct. 7, 1982.

---

Philip I. Steele, Rogin, Nassau, Caplan, Lassman & Hirtle, Hartford, Conn., for plaintiff.

John B. Nolan and James J. Tancredi, Day, Berry & Howard, Hartford, Conn., for defendant.

## MEMORANDUM AND DECISION

KRECHEVSKY, Bankruptcy Judge.

### I.

### ISSUE

This proceeding presents as a legal issue the reach of 11 U.S.C. § 525 which purports to protect former bankrupts and debtors from discriminatory treatment by governmental units. The proceeding also raises the factual issue of whether a bankrupt was denied mortgage financing by a state governmental unit because he had discharged his student loan liabilities in 1977.

### II.

### BACKGROUND

Larry Rose is thirty years old, single, and with no dependents. He is a graduate of Howard University and holds a master's degree from American International College. For the past four years, he had been employed in the Department of Human Resources of the State of Connecticut as a training coordinator and earns approximately $20,500.00 annually. In 1977, after having been unemployed for a year, Rose filed a chapter XIII wage earner's plan

under the Bankruptcy Act of 1898. His indebtedness primarily consisted of medical bills and $7,000.00 of unpaid student loans. Unable to secure creditor consent to his chapter XIII plan, Rose converted his case to a liquidation case and received a discharge on November 22, 1977.

In the summer of 1981, Rose was interested in buying a home and contacted the Connecticut Housing Investment Fund (CHIF), an organization which assists and counsels persons about residential mortgage financing under state funded programs. CHIF personnel advised him first to enter into a sales contract for property he wished to buy. On October 16, 1981, he signed a contract to buy a condominium unit at 20 May Street, Hartford, Connecticut. The purchase price was $35,000.00 with the sale contingent upon Rose being able to secure a first mortgage for $26,250.00 and a second mortgage for $8,650.00, both mortgages to be so-called CHIF mortgages.[1] Rose then completed various documents furnished by CHIF for the mortgage applications. He was told that his application for the first mortgage loan would be sent to the Connecticut Housing Finance Authority (CHFA) for approval, and that the second mortgage application would be filed with the Connecticut Department of Housing (DOH).[2] CHFA is a public instrumentality and a political subdivision of the State of Connecticut established to alleviate the housing shortage for low and moderate-income families, and persons in certain urban areas, by providing mortgage financing at below prevailing market rates.[3]

Under Conn.Gen.Stat. § 8–250(hh) (1981), applications for urban area mortgages, such as the one sought by Rose, can only be considered when the desired loan is not otherwise available on reasonable terms to the applicant. CHFA thus requires proof of refusal of the requested loan from two financial institutions.[4] Rose applied to two Hartford banks and received written refusals which he forwarded to CHIF. Lending institutions, such as McCue Mortgage Co. (McCue), participate in the CHFA program by originating and processing loan applications for CHFA review. Rose was sent by CHIF to McCue to file his application for the first mortgage. Rose filled out financial statements and other documents at McCue and secured an appraisal of the property showing a fair market value of $38,000.00. Included with these documents was a letter written by Rose, at McCue's request, explaining the circumstances of his bankruptcy in 1977. In this letter, he noted that he has since borrowed and repaid over $5,000.00 to the Connecticut State Employees Credit Union. McCue submitted this documentation to CHFA on or about November 16, 1981.

On November 19, 1981, McCue received a written notice from CHFA stating that Rose's application was denied. Of the thirty possible reasons for rejection set forth on the form notice, two were checked off as applicable to Rose's application: "Bankruptcy" and "We do not grant credit to any applicant on the terms and conditions you request." Under a section described as "Other-Specify," the notice stated the following:

> The above applicant is not creditworthy. CHFA would reconsider its decision only when presented with certified evidence that Mr. Rose has opened a new loan with the Student Loan Foundation to repay loan charged-off in bankruptcy in 1977.

---

1. The contract expired November 30, 1981 and Rose now occupies the unit under a lease which contains an option for him to buy the unit at the original purchase price.

2. Combined mortgaged programs are designed for individuals who do not have accumulated assets for a down payment on a house.

3. CHFA accomplishes this by issuing tax-exempt bonds and using the proceeds to fund its mortgage programs. Conn.Gen.Stat. § 8–241 to § 8–265c (1981). *See Fidelity Guarantee Mortgage Corp. v. Connecticut Housing Finance Authority,* 532 F.Supp. 81 (D. Ct., D. Conn.1982).

4. Rose was seeking a first mortgage loan of $26,250.00 for a term of 30 years at 12% interest.

The rejection notice was dated November 18, 1981 and issued over the name of Therese O. Korsgren, Mortgage Underwriter Officer. On November 23, 1981, Rose requested a review of the denial of his mortgage application.[5] By notice dated December 22, 1981, and signed by Stuart Y. Jennings, Deputy Director, Rose was notified that his request was again denied because he was not creditworthy. The notice included the following paragraph:

> Section 4.103 of the Manual requiring evidence of a credit reputation acceptable to a prudent institutional lender has not been met. The applicant, with his existing debt, an application for a second mortgage loan for a downpayment and reliance on a gift for closing costs, has not indicated that he had changed from a past history of too much indebtedness which led to bankruptcy.

No mention was made in the letter of the requirement of the student loan reaffirmation. The letter stated that Rose's application could not be resubmitted.

Rose instituted the present proceeding by filing a complaint against CHFA and DOH alleging, *inter alia,* that the failure to grant his mortgage application was in violation of 11 U.S.C. § 525 and requesting an injunction restraining the defendants from refusing to grant his mortgage applications. Subsequently, Rose voluntarily dismissed the action as to DOH.

### III.

### DISCUSSION

Both parties agree that 11 U.S.C. § 525 was enacted to protect present and former debtors and bankrupts against certain proscribed acts by governmental units. In relevant part, § 525 states:

> a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a

grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

That section, according to legislative history, codifies the decision in *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971) which held that an Arizona statute was unenforceable because it conflicted with the "fresh start" policy of bankruptcy. The Arizona statute permitted the state to suspend a driver's license because a judgment resulting from an automobile accident was unpaid as a consequence of a discharge in bankruptcy. *See* H.Rep. 595, 95th Cong., 1st Sess. 366–67 (1977); S.Rep. No. 989, 95th Cong., 2nd Sess. 81 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787; 3 *Collier's on Bankruptcy* § 525–02, 525–2 (15th ed. 1979).

### A.

Rose claims that the denial by CHFA of his mortgage application was due to his failure to repay the discharged student loans and that such denial is prohibited by § 525. CHFA claims at the outset that, as a matter of law, Rose cannot prevail because the denial of a mortgage loan is a transaction which falls outside the ambit of § 525 since it is not a "license, permit, charter, franchise or other similar grant" within the meaning of the statute. CHFA

---

**5.** CHFA Reg. § 8–248 E–4(c) (1981) provides that "[a]n application to CHFA for a commitment to purchase a CHFA mortgage loan may be resubmitted only once after having been rejected. Different CHFA staff members authorized to review mortgage loans shall review the submission and any resubmission of an application."

says that an extension of credit falls under none of the listed transactions and the doctrine of *ejusdem generis* should be applied to the phrase "other similar grant." [6]

Courts to date have found § 525 applicable to a variety of circumstances. The most straightforward examples are those akin to the *Perez* situation where a state refuses to renew a debtor's driver's license because a tort judgment was discharged in bankruptcy.[7] Courts have also found violations of § 525 in matters involving government contracts, *In re Marine Electric Railway Prod. Div., Inc.,* 17 B.R. 845, 8 B.C.D. 977 (Bkrtcy. Ct., E.D.N.Y.1982); *In re Coleman Am. Moving Serv., Inc.,* 8 B.R. 379, 7 B.C.D. 142 (Bkrtcy.Ct., D.Kan.1980); public housing, *In re Gibbs,* 9 B.R. 758, 7 B.C.D. 445 (Bkrtcy. Ct., D.Conn.1981); liquor licenses, *In re Maley,* 9 B.R. 832, 7 B.C.D. 471 (Bkrtcy.Ct., W.D.N.Y.1981); college transcripts, *Lee v. Bd. of Higher Ed. of New York,* 1 B.R. 781 (D.Ct., S.D.N.Y.1979); and student loans, *In re Richardson,* 15 B.R. 925, 8 B.C.D. 157 (Bkrtcy.Ct., E.D.Pa.1981). One decision granted preliminary relief to a debtor whose right to act as a self-insurer under the state's workers' compensation law was summarily suspended when it filed a petition under chapter 11. *In re Hillcrest Foods, Inc.,* 10 B.R. 579, 7 B.C.D. 735 (Bkrtcy.Ct., D.Me.1981).

The extension of the protection afforded by § 525 to such activities is in accord with the legislative history of the section:

> [T]he section is not exhaustive. The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination. The courts have been developing the *Perez* rule. This section permits further development to prohibit actions by governmental or quasi-governmental organizations that perform licensing functions, such as a State bar association or a medical society, or by other organizations that can seriously affect the debtors' livelihood or fresh start, such as exclusion from a union on the basis of discharge of a debt to the union's credit union.

H.Rep. No. 595, 95th Cong., 1st Cong. 366–67 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 81 (1978), U.S.Code Cong. & Admin. News 1978 at 5867, 6323. Section 525, however, does not prohibit private discrimination, *In re Coachlight Dinner Theatre of Nanuet, Inc.,* 8 B.R. 657, 7 B.C.D. 226 (Bkrtcy.Ct., S.D.N.Y.1981), nor relieve debtors from requirements applicable to all. " '[Section.525] does not prohibit consideration of other factors such as future financial responsibility or ability, and does not prohibit imposition of requirements as net capital rules, *if applied nondiscriminatorily.*' " *Henry v. Heyison,* 4 B.R. 437, 442, 6 B.C.D. 243, 246 (D. Ct., E.D.Pa.1980) (citing H. Rep. No. 595, 95th Cong., 1st Sess. 367 (1977)).

Taking into account the admitted status of CHFA as a governmental unit, the public purposes of the financing offered by CHFA, and the developing law as to the types of activity encompassed by § 525, I conclude that Congress intended to prevent discriminatory treatment in the field of mortgage financing. CHFA would have the court construe the existing case law to apply § 525 only "to areas of life which affect a debtor's ability to maintain a livelihood (i.e., to obtain and maintain employment and access thereto)." CHFA Memorandum of Law at 13. I do not believe § 525 should be so read. If a state has chosen to enact a program of home financing for its citizens, § 525 prohibits that state from exempting debtors or bankrupts from those benefits solely because of bankruptcy and without taking into account

---

**6.** "The rule of *ejusdem generis* is a common sense doctrine which teaches: 'Where general words follow specific words in an enumeration describing the legal subject, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.' " *Ass'n of American R.R. v. United States,* 603 F.2d 953, 963 (D.C. Cir.1979) (quoting 2A *Sutherland Statutory Construction* § 47.17, at 103 (4th ed. 1973)) (footnotes omitted).

**7.** *See In re Shamblin,* 18 B.R. 800 (Bkrtcy.Ct., S.D. Ohio 1982) and cases cited there.

present financial capability. To hold to the contrary would frustrate the Congressional policy of granting the debtor a fresh start by denying him a means open to other citizens of acquiring a home.

### B.

CHFA next contends that, in any event, Rose's claim fails in its proof after a full trial. Noting that § 525 requires that the bankruptcy of the complainant must be the *sole* reason for the alleged discriminatory treatment, CHFA emphasizes that Rose was found to be "not creditworthy" in both the initial and final rejection letters. CHFA presses upon the court the testimony adduced from Mrs. Korsgren and Mr. Jennings, the CHFA officers who respectively issued the original and final rejection of Rose's application. Mrs. Korsgren testified she was the first one to review the documents sent over to CHFA by McCue. She stated that her decision to recommend rejection of the application was based on Rose having only $108.00 in cash and no other significant tangible assets despite his loans and income; that he had overdrawn his checking account eight times during 1981; that he had existing indebtedness of $1,350.00 with a credit union; that his housing expenses would increase $100.00 a month under the proposed loan; that he needed a second mortgage for the balance of the purchase price; and that he would require a gift from his father to pay for the closing costs. Mrs. Korsgren testified that she wrote "Reject" on the application and sent it to her superior, William G. Lancaster, for further action. During her testimony, she made no reference to Rose's bankruptcy nor to the statement on the rejection notice referring to the reconsideration of the rejection if Rose reaffirmed his student loans.

Mr. Jennings, the deputy director of CHFA, testified that he considered essentially the same factors as enumerated by Mrs. Korsgren when Rose requested a review of the rejection of the mortgage application. In addition, he stated that during his review he noted Rose's prior bankruptcy and the letter explaining it. He concluded that, all things considered, it was doubtful that Rose could afford the additional housing expense of $100.00. He stated that he took into account the time period from Rose's bankruptcy in evaluating his present creditworthiness. When asked by Rose's attorney why he considered bankruptcy at all, Jennings replied:

> We are not blind to an applicant's past credit history. If he has been adjudicated a bankrupt in the past, we will keep it in mind in evaluating the present creditworthiness. It does not mean the person does not get a loan. We will just look for a satisfactory explanation of present creditworthiness and very interested in the period of time since the bankruptcy to the time of application.

Transcript of May 3, 1982 at 123.

As was the case with Mrs. Korsgren, Jennings was not asked about and did not refer to the possibility of granting the mortgage if Rose reaffirmed the student loans. Since both Korsgren and Jennings testified that Lancaster was initially responsible for the action on Rose's application, I am left with the understanding that Lancaster authored the rejection notice referring to reaffirmation of the student loans before the application would be reconsidered. Neither party called Lancaster as a witness, although it appears he is presently employed by CHFA. I am, therefore, faced with a situation where the original rejection letter contains, among other reasons, a clearly impermissible one for denying Rose's application: a demand that he reaffirm student loans. However, the CHFA personnel who originally and finally rejected Rose's mortgage application reasonably supported their decisions without reference to the student loan reaffirmation request imposed by a third person. I, therefore, cannot find on the record made in this proceeding that Rose's prior bankruptcy was the sole reason for the denial of his loan. And this is so whether the word "solely" as used in § 525 is given a strict

construction as requested by CHFA or a broad one as sought by Rose.[8]

I believe that if I were passing on Rose's mortgage application, I would grant it in view of his improving financial condition. But that is not the issue. The issue is whether Rose was denied mortgage financing solely because he had not paid a debt that was discharged in bankruptcy. After hearing and seeing these witnesses, I am unable to conclude that the testimony given by Korsgren and Jennings at trial setting forth the reasons for denying Rose's application was untrue, synthetic or meant to cover up another motivation. Rose has not borne his burden of proof.

Rose also claims in the second count of his complaint that the action of the defendant was "contrary to and in violation of the Equal Protection Clause of the 14th Amendment of the United States Constitution." In view of my conclusion on the § 525 issue, I find Rose has not borne his burden of proof under the second count.

Rose's request for a permanent injunction must be, and hereby is, denied, and judgment is rendered for the defendant, CHFA.

This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Rule 752 of the Rules of Bankruptcy Procedure.

---

**8.** Rose claims that "solely" could be considered as meaning "primarily" or "predominately", so that the mere presence of other facially plausible reasons will not bar the application of § 525.